# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IN RE TANGOE, INC. STOCKHOLDERS
LITIGATION

Lead Case No. 3:17-cv-00832

## RULING AND ORDER ON MOTION TO DISMISS

Plaintiffs, owners of shares of Tangoe common stock, filed a consolidated class action

Complaint ("CAC") against David Coit, James D. Foy, Gary Golding, Ronald Kaiser, Jackie R.

Kimzey, Gerald D. Kokos, Richard Pontin, Tangoe, Inc., and Noah Walley ("Defendants"),

alleging violations of Sections 14(e), 14(d)(4), and 20(a) of the Securities Exchange Act of 1934

("the Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78t(a), and SEC Rule 14d-9, in connection with a

tender offer for the sale of outstanding shares of Tangoe in 2017. [1] CAC ¶¶ 1, 11, ECF No. 46.

Defendants have moved to dismiss this case, arguing that Plaintiffs failed to state a claim

under Federal Rules of Civil Procedure 12(b)(6) and 9(b), as well as under the Private Securities

Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2). Mot. Dismiss, ECF No. 47.

For the reasons that follow, Defendants' motion to dismiss is **GRANTED**.

To the extent that the deficiencies identified in this ruling can be addressed, Plaintiffs

may file a motion for leave to amend the Complaint by September 7, 2018.

---

[1] "A tender offer typically involves a 'public offering' consisting of 'a general, publicized bid by an individual or group to buy shares of a publicly-owned company, the shares of which [are] traded on a national securities exchange, at a price substantially above the current market price.'" *Telenor E. Invest AS v. Altimo Holdings & Invs. Ltd.*, 567 F. Supp. 2d 432, 442–43 (S.D.N.Y. 2008) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 54 (2d Cir. 1985)).

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.    Factual Allegations

### 1.    The Parties

Plaintiffs bring claims against the following Defendants:

- Tangoe, a Delaware Corporation and a "global telecom expense management solutions company." CAC ¶ 12. Previously based in Connecticut and now based in New Jersey, Mot. Dismiss at 2, Tangoe's stock traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ"), under the symbol "TNGO," until NASDAQ delisted it on March 14, 2017. CAC ¶ 12.

- James D. Foy, who allegedly served as Tangoe's Chief Executive Officer ("CEO") since May 2, 2016, and as a member of its Board of Directors (the "Board") since March 2014. *Id.* ¶ 13.

- Gerald G. Kokos, who allegedly served as a member of Tangoe's Board since September 2002, and as its Lead Director and Executive Chairman since May 2, 2016. *Id.* ¶ 14.

- David M. Coit, who allegedly has served as a member of the Board since August 2006. *Id.* ¶ 15.

- Gary Golding, who allegedly has served as a member of the Board since September 2002. *Id.* ¶ 16.

- Ronald W. Kaiser, who allegedly has served as a member of the Board since January 2009. *Id.* ¶ 17.

- Jackie R. Kimzey, who allegedly has served as a member of the Board since March 2008. *Id.* ¶ 18.

- Richard S. Pontin, who allegedly has served as a member of the Board since March 2007. *Id.* ¶ 19.

- Noah J. Walley, who allegedly has served as a member of the Board since July 2008. *Id.* ¶ 20.

### 2.    Securities and Exchange Commission ("SEC") and NASDAQ Filings

Plaintiffs allege that, on March 7, 2016, Defendants announced that Tangoe's financial statements for 2013, 2014, and the first three quarters of 2015 needed revision because of "errors in recognizing revenue, primarily non-recurring revenue." CAC ¶ 33. The announcement

allegedly assured investors that Tangoe's core operations and cash flow would be "minimally affected or unaffected." *Id.* Tangoe's stock price allegedly immediately dropped after the announcement, but "several analysts maintained price targets ranging from $7.00 to $14.00 per share." *Id.*

On March 15, 2016, in a Form 12b-25[2], Tangoe allegedly reported that it would not timely file its Form 10-K.[3] *Id.* ¶ 34. Tangoe allegedly stated that "[a]lthough the Company cannot at this time estimate when it will complete the Restatement and file its restated financial statements and its Form 10-K for the year ended December 31, 2015, it is *diligently pursuing completion of the Restatement* and intends to file the Form 10-K as soon as reasonably practicable." *Id.* ¶ 34 (emphasis added by Plaintiffs in CAC). NASDAQ allegedly responded by informing Tangoe that it was in violation of NASDAQ rules and could be delisted if it did not comply by May 20, 2016. *Id.*

In April 2016, Tangoe allegedly replaced its Chief Financial Officer ("CFO") Gary P. Martino with an interim CFO, Jay Zager. *Id.* ¶ 35. In early May, Tangoe allegedly replaced its

---

[2] The SEC requires that, "[i]f all or any required portion of an annual or transition report . . . a quarterly or transition report . . . or a distribution report" required under Sections 13 or 15(d) of the Exchange Act "is not filed within the time period prescribed for such report, the registrant, no later than one business day after the due date for such report, shall file a Form 12b-25 (17 CFR 249.322) with the Commission which shall contain disclosure of its inability to file the report timely and the reasons therefore in reasonable detail." 17 C.F.R. § 240.12b-25(a); *see, e.g.*, *In re Magnum Hunter Resources Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 286 (S.D.N.Y. 2014) (describing that company submitted several "Notification[s] of Late Filing," through Forms 12b–25, indicating "that it was 'working diligently on a restatement of its financial statements for prior periods, including 'evaluating identified control deficiencies and the closing and reporting process'").

[3] "The federal securities laws require public companies to disclose information on an ongoing basis. For example, domestic companies must submit annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K for a number of specified events and must comply with a variety of other disclosure requirements. The annual report on Form 10-K provides a comprehensive overview of the company's business and financial condition and includes audited financial statements." Form 10-K, the Securities and Exchange Commission, available at https://www.sec.gov/fast-answers/answers-form10khtm.html (last visited 7/2/2018).

The SEC requires that "[i]f all or any required portion of" a Form 10-K "is not filed within the time period prescribed for such report, the registrant, no later than one business day after the due date for such report, shall file a Form 12b-25 (17 C.F.R. § 249.322) with the Commission which shall contain disclosure of its inability to file the report timely and the reasons therefore in reasonable detail." 17 C.F.R. § 240.12b-25.

Chairman and CEO, Albert R. Subbloie, Jr., with an interim CEO, James D. Foy, and an interim Chariman, Gerald G. Kokos. *Id.* On May 16, 2016, Tangoe allegedly engaged Mr. Stifel as its advisor. *Id.*

On May 19, 2016, Tangoe allegedly announced that it had received a second notice from NASDAQ, indicating it was not in compliance with NASDAQ's rules requiring periodic financial reporting with the SEC. *Id.* ¶ 36. Plaintiffs allege that, "[a]gain, the Company stressed that they were diligently pursuing completion of the Restatement and intended to file its 10-Q for the quarterly period ended March 31, 2016, as soon as reasonably practicable."[4] *Id.*

On August 10, 2016, Tangoe allegedly filed another Form 12b-25, stating that its quarterly Form 10-Q for the period ending on June 30, 2016, would not be timely filed. *Id.* ¶ 37. Plaintiffs allege that "[t]he Company went on to explain that the amount of misstated revenue was significantly more than previously announced," and that "the Restatement would not be completed prior to September 12, 2016." *Id.* Tangoe allegedly sought another extension from NASDAQ to regain compliance with the filing requirements, and NASDAQ stated that, if Tangoe did not "submit an updated plan for the Restatement," by August 30, 2016, it would be delisted. *Id.*

On September 13, 2016, NASDAQ allegedly sent Tangoe a letter with a plan to delist Tangoe's stock as a result of its repeated violations of filing requirements. *Id.* ¶ 38. NASDAQ allegedly indicated that the stock would be suspended starting September 22, 2016, and that NASDAQ would file a Form 25-NSE with the SEC, which would remove the company's listing

---

[4] "The Form 10-Q includes unaudited financial statements and provides a continuing view of the company's financial position during the year. The report must be filed for each of the first three fiscal quarters of the company's fiscal year." Form 10-K, the Securities and Exchange Commission, available at https://www.sec.gov/fast-answers/answersform10qhtm.html (last visited 7/2/2018).

from NASDAQ. *Id.* Tangoe stated that it planned to appeal the decision, submit an amended plan to deal with the Restatement, and request a maximum extension to file until March 2017. *Id.*

On November 9, 2016, NASDAQ allegedly granted Tangoe a maximum extension until March 10, 2017, to finish the Restatement and come up to date with all required filings. *Id.* ¶ 39. Plaintiffs allege that "[t]he Company stated that it was hopeful that it would regain compliance with Nasdaq's filing requirement, but made no assurances." *Id.*

On November 10, 2016, Tangoe allegedly filed another Form 12b-25, indicating that it would not timely file a quarterly Form 10-Q for the period ending on September 30, 2016. *Id.* ¶ 40. Plaintiffs allege that "[t]his time, the Company indicated that the misstated revenue was nearly double the amount originally represented, and that operating income would be *substantially* affected." *Id.* (emphasis added by Plaintiffs in CAC). Tangoe also allegedly stated:

> The internal investigation overseen by the Audit Committee in connection with the Restatement is *substantially complete*. The Company has also substantially completed its internal review of the financial statements for the periods being restated and is currently working with the Company's independent registered public accounting firm as it audits the restated year-end financial statements. In addition, the Company is completing its closing procedures and preparing interim financial statements for its quarters ending March 31, 2016, June 30, 2016 and September 30, 2016, after which it will work with its independent registered public accounting firm as it reviews the interim financial statements.

*Id.* (emphasis added by Plaintiffs in CAC).

Plaintiffs alleged that, on December 14, 2016, "[d]ue to the potential uncertainty of holding an annual [stockholder] meeting without the ability to solicit proxies, the Board concluded that they did not want to risk losing their seats at an election solely voted on by stockholders in attendance at the meeting." *Id.* ¶ 41.

On December 20, 2016, the Audit Committee allegedly told the Board that "it was not practical to complete the Restatement by the March 10 delisting deadline," and, on December 28,

2016, the Audit Committee allegedly confirmed that it could not "conclude with any degree of reliability that the Restatement would be complete by the March 10, 2017 deadline at any reasonable cost." *Id.* ¶¶ 42–43. On January 3, 2017, Tangoe allegedly "notified Nasdaq that it was unlikely to complete the Restatement by the March 10, 2017 deadline." *Id.* ¶ 44. Plaintiffs allege that "[a]ccording to the Recommendation Statement, it was at this point that the Board noted the potential for an acquisition transaction in the near term may obviate the need to complete a Restatement." *Id.* Plaintiffs also allege that "[t]he Recommendation Statement also revealed that despite the Company's statements in its November press release that things were 'substantially complete,' Tangoe had not begun to implement the audit plan of its independent registered accounting firm," and therefore "the Board decided to shift focus to producing a quality of earnings report to help execute a potential transaction." *Id.*

On January 4, 2017, NASDAQ allegedly informed Tangoe that its stock could be delisted for failure to hold an annual stockholder meeting. *Id.* ¶ 45. Plaintiffs allege that "[g]iven this additional basis to delist Tangoe, it appears that the decision to shift focus to selling the Company was not the result of the inability to timely complete the Restatement, but a consequence of the Board's selfish decision to avoid being ousted at an annual stockholder meeting." *Id.*

On March 10, 2017, Tangoe informed stockholders that NASDAQ had made a final determination to delist the company's common stock, and, four days later, trading of Tangoe's shares ended. *Id.* ¶ 46.

Plaintiffs allege that "during the course of these efforts, the Company devoted significant internal resources to pursue the Restatement, expended approximately $16 million in costs in 2015 and 2016 for outside assistance on the Restatement, yet failed to ever issue a Restatement

or any audited financial statements from the time of the Restatement through the closing of the Transaction." *Id.* ¶ 47.

Plaintiffs allege that, on March 23, 2017, undisclosed stockholders owning 7% of Tangoe's common stock threatened a proxy contest to unseat a majority of the Board if the Board did not complete a transaction. *Id.* ¶ 55.

### 3. Awards and Benefits to Board Members and Management

Plaintiffs allege that, while the Restatement was still pending, "SEC rules barred Tangoe from issuing traditional equity awards to the Board or management." *Id.* ¶ 48. Plaintiffs allege that Tangoe's Board and management avoided those rules by entering "into Equity Award Replacement Compensation Agreements ('EARCAs') with the Company," so that "Tangoe's officers and directors could still receive equity compensation, but that compensation would only have value upon a 'change in control.'" *Id.*

Plaintiffs allege that Tangoe and Mr. Foy, who was, at that point, the interim CEO, entered into an employment agreement on June 6, 2016, under which Mr. Foy became the acting CEO and, "subject to the Company's ability to register the grant of such award on a Form S-8, Mr. Foy [would] be entitled to receive an award of 100,000 restricted stock units (RSUs)." *Id.* ¶ 49. On June 8, 2016, Mr. Coit, Mr. Golding, Mr. Kaiser, Mr. Kimzey, Mr. Pontin, and Mr. Walley each allegedly received "EARCAs with respect to 15,142 measurement shares." *Id.*

On July 28, 2016, the Board allegedly changed Mr. Foy's employment agreement to make him the CEO and to provide him with 100,000 restricted stock units that would vest upon change in control and 100,000 new EARCA shares. *Id.* ¶ 50. That same day, Scott Snyder allegedly received 50,000 EARCA shares and Charles Gamble allegedly received 20,000 EARCA shares, all due to vest and be converted to common shares upon a change in control. *Id.*

On August 15, 2016, the Board allegedly made Mr. Zager, then the interim CFO, the CFO, and paid him $400,000 in cash. *Id.* ¶ 51. The Board also allegedly granted Mr. Foy 400,000 EARCA shares and Mr. Zager 100,000 EARCA shares, all to vest upon a change in control of the company. *Id.* Plaintiffs allege that these shares were different from the other EARCA shares, however, because "25% of the shares would only vest upon a change in control of the Company resulting in consideration payable to holders of common stock of the Company exceeding specified thresholds," though Tangoe allegedly "never stated what those thresholds were." *Id.*

On January 11, 2017, the Board allegedly approved a "Retention Agreement" for Mr. Foy, under which he would receive severance benefits in the event of termination for reasons other than cause, death, disability, or resignation for good reason. *Id.* ¶ 53. Plaintiffs allege that "[a]ssuming a Qualifying Termination followed the Merger, the retention agreement secured Foy an additional $892,140, consisting of $656,250 in salary-based severance and $235,890 in bonus-based severance." *Id.*

On February 2, 2017, the Board allegedly approved amendments to Mr. Foy and Mr. Zager's respective EARCAs, "lowering the minimum threshold consideration necessary to trigger their respective vesting provisions." *Id.* ¶ 54.

Plaintiffs allege that, "[r]ather than act in the best interest of all stockholders by completing the Restatement and executing the Company's standalone plan, as it had determined to do in the spring of 2016, the Board acted selfishly and disloyally by pushing through an inadequate offer with Marlin and, at the same time, ensuring that millions of dollars in equity award equivalents would vest upon consummating the Transaction." *Id.* ¶ 56. Plaintiffs further allege that the Individual Defendants "understood that they were set to collectively receive

nearly $5 million in exchange for their measurement shares under the EARCAs" if they voted for the transaction with Marlin, and "[i]f the Director Defendants voted against the Transaction and opted to complete the Restatement and proceed as a standalone company, their EARCAs would have been worthless." *Id.* ¶ 57.

### 4. The Sale of the Company

Plaintiffs allege that "accounting failures marred the sales process from the start" because Tangoe was unable to provide potential bidders with "any accurate, audited GAAP financial statements," and therefore "many potential bidders were unable to participate in the sales process." *Id.* ¶ 58.

Plaintiffs allege that, between June 2016 and December 2016, Tangoe had "preliminary discussions with several parties regarding potential investment in the Company and/or acquisition of the Company," including Vector Capital IV., L.P. and its affiliates, which owned 9.9% of Tangoe's outstanding common stock, Clearlake Capital Partners IV GP, L.P. and its affiliates, which, as of June 23, 2016, owned 14.9% of Tangoe's outstanding common stock, and Marlin and its associates, which, as of June 24, 2016, owned 10.4% of Tangoe's outstanding common stock. *Id.* ¶¶ 59–60, 61.

Plaintiffs allege that, in December 2016, Marlin verbally proposed a transaction at $7.00 per share, and Clearlake and Vector proposed a joint transaction at a price ranging between $7.00 and $7.50 per share. *Id.* ¶ 63. Plaintiffs allege that, on December 29, 2016, Tangoe "received a revised letter from Marlin substantially similar to the letter of December 27, 2016, but confirming that neither continued listing of the Common Stock on Nasdaq nor audited financial statements would be a closing condition." *Id.* ¶ 64. Also, on that day, Marlin submitted a second amendment to its Schedule 13D with the SEC. *Id.* The amendment stated that Marlin wanted to

acquire "all of the outstanding common stock, through a tender offer or otherwise, for $7.50 per share in cash, subject to, among other things, reaching agreement on all material terms." *Id.*

On January 3, 2017, Tangoe allegedly issued a press release "confirming receipt of the proposal from Marlin and the joint proposal from Clearlake and Vector, that the Company had notified Nasdaq that it was unlikely to complete the Restatement by the March 10, 2017 deadline, that the Board would carefully evaluate the proposals and was focused on maximizing stockholder value, and that the Company had retained Stifel as financial advisor to assist in these efforts." *Id.* ¶ 65.

On March 9, 2017, Tangoe allegedly received a letter from Marlin proposing to acquire Tangoe for a cash tender offer of $6.50 per share. *Id.* ¶ 66. On March 28, 2017, Mr. Foy and Mr. Kokos spoke with Marlin representatives about integrating the two management teams. *Id.* ¶ 67. On April 28, 2017, Tangoe and Marlin announced a merger agreement at $6.50 per share. *Id.* ¶ 68.

Plaintiffs allege that the $6.50 offer price "does not represent fair value for Tangoe stockholders," and that Tangoe previously had been trading at an average price above $8.00. *Id.* ¶ 69. Plaintiffs allege that, since Tangoe went public in 2011, it "has established itself as a leader in the connection lifecycle management space," that it "holds a significant size advantage to many of its competitors," that its clients include established entities such as "IBM, SAP, American Express, PWC, FedEx, Kraft Foods, CVS, and Comcast," and that it has maintained a net cash balance. *Id.* ¶ 70. Moreover, Plaintiffs allege that analysts project "a positive outlook for Tangoe," including growth and high price targets. *Id.* ¶ 72. Plaintiffs therefore allege that "the fluctuations in Tangoe's stock price did not reflect changes in its underlying value, but the lack of information disseminated by the Tangoe Board." *Id.* ¶ 75.

### 5.     The Recommendation Statement

On May 12, 2017, Tangoe allegedly filed a Recommendation Statement with the SEC in support of the Tender Offer commenced by Marlin. *Id.* ¶ 76. Plaintiffs allege that the Recommendation Statement "contained material misrepresentations and omissions of fact that forced Tangoe's stockholders to decide whether to tender their shares without adequate information." *Id.* Plaintiffs allege that those misstatements included:

> (i) the circumstances surrounding the Company's failure to complete the Restatement, including the likelihood that Tangoe could ever complete the Restatement and, if completable, a reasonable estimation of when it believed the Restatement would be completed and the Company's stock relisted; (ii) any non-merger alternative options left for the Company in light of the Restatement and delisting; (iii) the conflicts of interest faced by Tangoe's management and directors as a result of the EARCAs and their subsequent revisions; (iv) the severity and degree of the numerous revisions of the Company's financial projections; (v) the valuation analyses prepared by Stifel in support of its "fairness opinion"; and (vi) the complete lack of any audited GAAP financial statements.

*Id.* ¶ 77. Plaintiffs allege that Tangoe has been "unclear and misleading in their communications with stockholders, Nasdaq, and the SEC," since March 2016 and continued to do so even after the release of the Recommendation Statement. *Id.* ¶ 78.

Plaintiffs allege that the Recommendation Statement failed to state whether Tangoe had a legitimate chance of completing the Restatement and regaining compliance with NASDAQ, "misstated the Board's desire to complete the Restatement," and "failed to discuss what would happen with the Restatement in the event a deal to acquire Tangoe could not have been made." *Id.* ¶ 79. Moreover, Plaintiffs allege that Tangoe possessed information that it concealed from stockholders and the public related to the Restatement. *Id.* ¶ 80. Plaintiffs allege that, as a result, stockholders did not have the means "to evaluate the choice they were being asked to make— accept the Offer Price that reflected the depressed value caused by the Company's regulatory

non-compliance or stay the course in hopes that the Company might return to the good graces of regulators." *Id.* ¶ 81. As a consequence, Plaintiffs allege, the market did not "absorb and reflect the true value of the Company," placing stockholders in a compromised position, and driving potential bidders away. *Id.* ¶¶ 82–83.

On June 5, 2017, the SEC allegedly sent a letter to Tangoe, expressing concern that Tangoe's delinquency in reporting information "would prevent Tangoe investors from making an informed decision." *Id.* ¶ 84. In a second letter, dated June 14, 2017, the SEC wrote: "[W]e remind the company and its management of their obligation to ensure that investors have been provided with all material information necessary to evaluate the proposed transaction, particularly given that the company is not current in its Exchange Act reporting obligations." *Id.* ¶ 84. Plaintiffs allege that stockholders should have been provided information about what would happen if the transaction with Marlin did not go forward. *Id.* ¶ 85.

Plaintiffs also allege that the Recommendation Statement "failed to provide full and adequate disclosure of the conflicts of interest faced by Tangoe's officers and directors," including that their EARCAs "were only payable upon a change in control, termination without cause, or the death of the party." *Id.* ¶ 86. Specifically, Plaintiffs allege that information that Defendants had adjusted the thresholds for their payouts "would have informed stockholders how much the failure to complete the Restatement cost them." *Id.* ¶ 87.

In addition, Plaintiffs allege that Defendants manipulated financial projections and omitted material information from statements to "make the eventual Offer Price appear more attractive to Tangoe stockholders." *Id.* ¶ 90. Plaintiffs allege that when Tangoe published a Discounted Cash Flow Analysis, it failed to disclose key components of the analysis that would have been "material to Tangoe stockholders," and their omission rendered the Discounted Cash

Flow Analysis (part of the Recommendation Statement) "incomplete and misleading." *Id.* ¶¶ 91–93. Plaintiffs also allege that two other analyses, Selected Company and Selected Transactions, "the Recommendation Statement failed to disclose individual multiples for the companies and transactions observed in the analysis," leaving stockholders without "the information to determine how the selected companies and transactions actually compared to" Tangoe or the Transaction with Marlin. *Id.* ¶ 94. Moreover, Plaintiffs allege that the analyses failed to include an implied valuation range for the comparable analyses, and the "only valuation performed, the DCF, was watered down by artificially deflated projections and incompletely disclosed to stockholders." *Id.* ¶ 95. Plaintiffs assert that the "above-referenced omitted information, if disclosed, would have significantly altered the total mix of information available to Tangoe's stockholders." *Id.* ¶ 96.

### B.    Procedural History

On May 18, 2017, Mr. McArthur, on behalf of himself and a proposed class, filed a Complaint alleging violations of Section 14(d), 14(e), and 20(a) of the Securities Exchange Act of 1934. Compl., ECF No. 1. On June 1, 2017, Defendants filed a notice of a related case, *Joseph Levine v. Tangoe, Inc., et. al.*, No. 3:17-cv-00873 (AWT). ECF No. 17. On August 7, 2017, Mr. McArthur and Mr. Levine moved to consolidate the related cases, to be appointed co-lead plaintiffs, and approval of Levi & Korinsky LLP and Monteverde & Associates PC as co-lead counsel. ECF No. 32. The Court granted the unopposed motion, *see* ECF No. 44, on October 4, 2017. ECF No. 45.

On November 3, 2017, Plaintiffs filed a Consolidated Class Action Complaint, again alleging violations of Sections 14(d), 14(e), and 20(a) of the Securities Exchange Act of 1934. ECF No. 46. In Count One, Plaintiffs allege that "Tangoe filed and delivered the

Recommendation Statement to its stockholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements," including "information about the consideration offered to stockholders via the tender offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants," in violation of Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e). CAC at 27–28.

In Count Two, Plaintiffs allege that Defendants violated Sections 14(d)(4) of the Securities Exchange Act of 1934 and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9. *Id.* at 29. Plaintiffs argue that Defendants "caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Transaction," while omitting material facts, "which render the Recommendation Statement false and/or misleading" because "Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading." *Id.* at 29.

In Count Three, Plaintiffs allege that the Individual Defendants violated Section 20(a) of the Exchange Act because, by virtue of their roles at the Company they influenced or controlled the decisions made there, "including the content and dissemination of the various statements that Plaintiffs contends are false and misleading." *Id.* at 30. Plaintiffs argue that the Individual Defendants had the ability to control or correct any misstatements or omissions released in the Recommendation Statement, and their failure to do so makes them liable under Section 20(a). *Id.*

On December 18, 2017, Defendants moved to dismiss. Mot. Dismiss at 1. Defendants argue that the merger with Marlin was a successful cash-out merger and Tangoe stockholders received a 19.5% premium over Tangoe's stock price at the time of the deal announcement.

Memo. in Support of Mot. Dismiss at 1, ECF No. 47-1. Defendants also argue that the Complaint

failed to meet the heightened pleading standard established by the Private Securities Litigation

Reform Act ("PSLRA") and must be dismissed under Rule 12(b)(6) for failure to allege that

Defendants made a material misrepresentation, with the requisite intent, that caused Plaintiffs

economic loss. *Id.* at 2. Moreover, Defendants argue that "to the extent Plaintiffs' claims

challenge the sales *process*, as opposed to the *disclosures* relating to the tender offer, they are not

actionable under the Exchange Act because such process claims are the province of Delaware

law." *Id.*

Defendants also attached, along with a declaration by Ivan Panchenko, a lawyer for

Tangoe, the documents referenced in the Complaint, including Forms 8-K and 12b-25 that

Tangoe submitted to the SEC between March 7, 2016, and June 16, 2017, and Tangoe's

Schedule 14D-9 Solicitation/Recommendation Statement, which was submitted to the SEC on

May 12, 2017. Panchenko Decl., ECF No. 48. Submitted after Tangoe and Marlin had negotiated

a draft agreement for the tender offer, the Recommendation Statement, Defendants argue,

addresses Plaintiffs' arguments and demonstrates that Defendants provided the necessary

information about the proposed transaction to stockholders. Mot. Dismiss at 4–5 ("Over the

course of 44 pages, the Recommendation Statement describes, among other things, (1) the

officers' and directors' financial interest in the transaction; (2) the chronology of the negotiation

process that led to the transaction; (3) the reasons for the Board's recommendation; (4) Stifel's

financial analyses; (5) Tangoe's financial projections; and (6) the effect of the tender offer on

shareholders' rights.") (citations omitted).

### 1.      Officers' and Directors' Financial Interest

Tangoe disclosed the following information about the officers' and directors' financial

interests in the transaction:

> The Company's executive officers and the members of the board of directors of the Company . . . may be deemed to have certain interests in the Offer and the Merger and related transactions that may be different from or in addition to those of the Company's stockholders generally. The Company Board was aware of those interests and considered them, among other matters, in reaching its decision to approve the Merger Agreement and related transactions.

14D-9 at 7.[5]

Tangoe stated that the officers and directors who owned shares in the Company would

receive the same compensation from a tender offer as other stockholders of the Company. *Id.* at 8

(explaining that "[i]f all such Shares were tendered pursuant to the Offer and accepted for

purchase and purchased by Purchaser or converted into the right to receive the Merger

Consideration pursuant to the Merger, the directors and executive officers and their affiliates

would receive an aggregate of $1,630,324 in Merger consideration, without interest, less any

required withholding taxes" and providing table listing each individual's potential cash

consideration).

Tangoe also explained the officers' and directors' stock options under a 2005 Stock

Incentive Plan and a 2011 Stock Incentive Plan. *Id.* at 8–9 ("Pursuant to the Merger Agreement .

. . each vested outstanding Company Stock option . . . that has an exercise price below the per

share Merger Consideration . . . will automatically be cancelled and converted into the right to

receive from the Surviving Corporation an amount of cash equal to the product of (i) the total

number of Shares then underlying such Company Stock Option multiplied by (ii) the excess, if

---

[5] The Court refers to the pagination in the 14D-9 as it was filed, as do Defendants in the motion to dismiss.

any, of the per Share Merger Consideration over the exercise price per Share of such Company

Stock Option, without any interest thereon."). Tangoe included a table that stated the number of

stock options that each director or officer held and the potential payable cash that that person

could receive as a result of the merger. *Id.* at 9. Tangoe also stated that the officers and directors

had an aggregate of 53,333 Restricted Stock Units ("RSU"), all held by Mr. Flynn, which

amounted to $346,665 based on the offer price of $6.50 per share. *Id.*

> Tangoe also stated that it had retention agreements with certain officers and directors:

> > The Company is party to retention agreements with each of Messrs.
> > Foy, Flynn, Sheridan, and Wansong, which specify the amounts
> > payable to such executive officer in connection with certain
> > termination events . . . . [They] will be entitled to the following
> > severance: a lump sum payment equal to (i) a pro rata portion of
> > 100% of the applicable executive officer's aggregate quarterly and
> > annual bonuses payable with respect to the last fiscal year ended
> > before termination," with certain other conditions related to
> > bonuses, and "upon a change in control, each of Messrs. Flynn,
> > Sheridan, and Wansong are entitled to full acceleration of any
> > unvested equity awards, but only Mr. Flynn has such awards.

*Id.* at 11–12. It also explained that it had entered into EARCAs with each executive officer and

director that "provide for payment of such awards upon the closing of a change in control, which

would include the Merger." *Id.* at 12. It listed the amount of measurement shares and the cash

consideration payable to each executive officer at the officer price of $6.50 per share. *Id.* at 13. It

also stated that "[t]he foregoing descriptions of compensation arrangements do not purport to be

complete and are qualified in their entirety by reference to the agreements, including any form of

amendment thereto, filed as Exhibits (e)(2) through (e)(16) to this Schedule 14D-9, which are

incorporated herein by reference."[6] *Id.*

---

[6] Exhibits (e)(2) through (e)(16) include: Amended and Restated Employee Stock Option/Stock Issuance Plans, the 2005 Stock Incentive Plan, the 2011 Stock Incentive Plan, Restricted Stock Unit Agreement plans, a form example of the Equity Award Replacement Compensation Agreement, the Company's employment agreement with J.D. Foy, and the Company's employment agreement with Jay Zager. *See* Form 14D-9 at 48–49.

Tangoe also stated that it would provide the officers and directors with "golden parachutes," and listed the terms of each individual's package. *Id.* at 13–15; *e.g.*, *id.* at 14 (providing table with cash, equity, and benefits values and explaining, "[t]he amount listed in this column represents the present value of the named executive officer's right to receive upon a termination by the Company without cause or resignation by the named executive officer's resignation for good reason, a lump sum cash payment equal to (i) a pro rata portion of 100% of the applicable named executive officer's aggregate quarterly and annual bonuses payable with respect to the last fiscal year ended before termination (or, for Mr. Foy, his 2017 target bonus), less any quarterly bonuses paid in the current fiscal year (but not below zero), with the proration based on the number of days in the fiscal year before employment ends and (ii) (x) the greater of 100% of his highest base salary during the two fiscal years prior to termination and (y) 100% of the applicable named executive officer's then current base salary (with the percentage in being 125% for Mr. Foy).").

### 2. The Chronology of the Negotiation Process that Led to the Transaction

The Recommendation Statement also explains the negotiation process that led to the potential merger. *Id.* at 16–29. It explained that, on August 6, 2015, "the Company reported lower than expected results of operations for the quarter ended June 30, 2015," when the Company's common stock dropped from $10.35, on August 6, 2015, to $7.09, on August 7, 2015. *Id.* at 16. The following December, the Board held a meeting where it "reviewed recent investments by Vector and Clearlake," two entities that owned approximately 9.9% and 14.9%, respectively, of Tangoe's outstanding common stock, and reviewed "inquiries from certain stockholders, including Vector, regarding the possible consideration of strategic alternatives and the business plan of the Company and its prospects as an independent entity." *Id.* At that point,

the directors all agreed that "the Company should continue to pursue its business plan as an independent entity." *Id.*

On March 7, 2016, Tangoe reported that it had found that it had "made errors in recognizing revenue, primarily relating to non-recurring revenue," and needed to restate its financial statements for 2013, 2014, and the first three quarters of 2015. *Id.* at 17. It "did not expect to file its Annual Report on Form 10-K with the SEC on a timely basis" and would instead "diligently pursue completion of the restatement as soon as reasonably practicable." *Id.* The common stock dropped from $7.75 on March 7, 2016, to $7.05 on March 8, 2016. *Id.*

Beginning in August 2015, Tangoe reported, its Audit Committee "held over 25 meetings concerning the oversight of the Restatement," initially focusing on identifying accounting errors, then on determining the scope of those errors, and eventually 'overseeing the preparation of revised financial statements and seeking an audit of financial statements by the Company's independent audit firm or another qualified independent audit firm." *Id.* Tangoe stated that it "devoted significant internal resources to pursue the Restatement, and expended approximately $16 million in costs in 2015 and 2016 for outside assistance on the Restatement." *Id.*

Tangoe also explained that, on March 18, 2016, Marlin and certain affiliates disclosed that it owned approximately 7.6% of Tangoe's outstanding common stock. *Id.* And on March 24, 2016, Tangoe received a letter from NASDAQ stating that the Company was not in compliance with NASDAQ's listing requirements because of its failure to file timely financial reports with the SEC. *Id.*

Tangoe stated that, on May 16, 2016, it engaged Stifel as its financial advisor "due to its reputation in the industry, experience with public software and technology companies, knowledge of the business and mergers and acquisitions expertise." *Id.*

On June 24, 2016, Marlin and its affiliates disclosed that it owned approximately 10.4% of Tangoe's outstanding common stock. *Id.*

Tangoe also disclosed that it had conversations with several potential "financial sponsors." *Id.* at 18. Tangoe explained that it received "a letter from Vector stating its interest in pursuing a negotiated acquisition of the Company and noted its history of prior acquisitions, including of companies that did not have audited financial statements." *Id.* Tangoe also "received a letter from Clearlake expressing concern that the Company had not taken steps to explore strategic alternatives, including with potential bidders like Clearlake that had disclosed significant ownership interests in the Company," and "requested access to confidential information pursuant to a confidentiality agreement to enable Clearlake to deliver a concrete proposal to the Company to maximize value for the Company's stockholders." *Id.*

Tangoe explained that it held a regularly scheduled meeting on July 28, 2016, to discuss certain changes in leadership at the Company, the state of the business, the pending Restatement, and potential acquisition proposals. *Id.* The Company considered "the fiduciary duties of directors in considering or responding to acquisition proposals, as well as the applicable requirements . . . to hold an annual meeting if requested by stockholders to do so and limitations on the Company's ability to solicit proxies should such a meeting be held in light of the pending Restatement." *Id.* After the meeting, "at the direction of the Company Board, representatives of Stifel sent proposed forms of confidentiality agreements, including standstill provisions, to Marlin, Clearlake, Vector and Sponsor 3, and contacted Sponsor 1, Sponsor 2 and an additional financial sponsor that [Tangoe] refer[s] to as Sponsor 4." *Id.*

During August and September of 2016, Tangoe reported, it held several Board Meetings and meetings with the various entities potentially interested in acquisition. *Id.* at 19. Eventually,

only Marlin and Clearlake and Vector were interested in proceeding with a transaction in the absence of audited financial statements.[7] *Id.* at 20–21. Marlin stated that it "would be prepared to propose a transaction at a small premium to current market prices (then trading in the range of $8.25 to $8.50 per share of Common Stock) subject to diligence if that would facilitate access to diligence materials," and Stifel responded that "all parties were proceeding on similar time frames, the Company was focused on the Restatement but would be opening an electronic data room soon, and the Company was interested in an informed bid with a more fulsome view of financing, rather than one not informed by diligence, but would relay the conversation to the Board." *Id.* at 20–21.

On December 14, 2016, Tangoe reported, the Board held a meeting to discuss "the status of the business and the Restatement, noted the obligation to confirm with NASDAQ by year end whether the Restatement could be completed prior to the March 10, 2017 delisting deadline, and discussed the significant ongoing costs associated with Restatement efforts in light of the Company's lower cash balances." *Id.* at 21. "Stifel reported that Marlin had verbally proposed a transaction at $7.00 per share and Clearlake and Vector had verbally proposed a joint transaction at a range of $7.00 to $7.50 per share, and that each indicated a willingness, if requested, to submit a written indication of interest to that effect . . . ." *Id.* The Company also reviewed financial projections, including by comparing the "histories and transactions for other companies that had experienced a stock delisting." *Id.* at 22.

---

[7] The Company continued to have certain conversations with potential sponsors, but those conversations, except with Marlin and Clearlake and Vector, did not result in a proposal. *See, e.g.*, 14D-9 at 24 ("On January 24, 2017, the Company executed a confidentiality agreement with Sponsor 8. On January 30, 2017, Sponsor 8 confirmed that audited financial statements and continued listing of the Company's Common Stock would not be conditions to any transaction. After performing limited diligence, Sponsor 8 informed the Company on February 11, 2017 that it would not pursue further discussions.").

On December 16, 2016, Tangoe explained that Stifel communicated with Marlin as well as Clearlake and Vector. *Id.* Each indicated that it could "complete diligence and be prepared to execute a definitive acquisition agreement," Marlin within five to six weeks, and Clearlake and Vector within five weeks. *Id.* "Each requested that the Company enter into an exclusivity agreement." *Id.*

On December 20, 2016, the Board held a meeting and "heard reports on the status of the Restatement, including preliminary indications that completion of a Restatement by the March 10, 2017 deadline might not be practicable," and considered proposed timelines from Marlin and Clearlake and Vector. *Id.*

On December 27, 2016, the Board held another meeting and considered reports on the Restatement, the costs of the ongoing efforts to complete it, and "lower than expected cash balances." *Id.* Later that day, Marlin proposed a cash tender offer at a price of $7.50 per share, with remaining diligence to be performed, and indicating that a NASDAQ delisting would not be a closing condition. *Id.* Clearlake and Vector reported the next day that they would send a letter by the end of the week. *Id.* The Company determined it "should inform NASDAQ it was unlikely the Company would complete the Restatement by the March 10, 2017 deadline." *Id.* On January 2, 2017, Clearlake and Vector offered a joint acquisition at $7.00 per share. *Id.* at 23.

On January 4, 2017, the Board reviewed the two potential offers, "determined that both were acceptable and instructed management to undertake negotiations with each and engage the firm determined to be most cost effective and timely." *Id.*

On January 8, 2017, "representatives of another financial sponsor, [referred] to as Sponsor 7, contacted Mr. Foy about its potential interest in a transaction," but after speaking with

Stifel and learning more preliminary background information about the Company, declined to pursue further conversations. *Id.* at 23–24.

On February 27, 2017, Tangoe reported, it received a letter from Marlin offering a cash tender offer of $6.50 per share, with certain conditions. *Id.* at 25.

On March 1, 2017, the Board met and discussed the proposal, including that Marlin's "proposed price was lower than in its prior indication of interest as a result of continued weakening in the Company's financial results and the resultant decrease in available debt financing." *Id.* Stifel also reviewed with the Board the Company's financial projections and "the preliminary valuation analyses and the Company's recent and projected results of operation." *Id.* The Board directed Stifel to request that "Marlin increase its price and remove some of the contingencies in its offer, and [] continue to request a proposal from Clearlake and Vector." *Id.* Later that day, Clearlake and Vector indicated "they were not prepared to make any acquisition proposal at that time, and request[ed] a period of up to three weeks to perform additional diligence with respect to a potential proposal." *Id.* "The letter also noted that, as large stockholders, they were supportive of the Company seeking other alternatives that might maximize stockholder value." *Id.*

After some negotiations, on March 10, 2017, the Board determined that it should enter into exclusive negotiations with Marlin. *Id.* at 26. Between March 17, 2017 and April 27, 2017, representatives negotiated the terms of a merger agreement, including by providing "information in response to diligence requests" including lower than expected financial projections. *Id.* The Company received multiple letters urging the Board to accept the transaction and indicating that stockholders would call an annual meeting to replace the majority of directors if no transaction was announced within several weeks. *Id.* at 26–27. On March 28, 2017, representatives from

Marlin and from Tangoe spoke about "possible ways to integrate the Company's management team with that of Parent." *Id.* at 27.

After several Board meetings during April 2017, where Board Members discussed potential five-year plans for the Company, its financial projections, and the merger agreement, at 2:30 a.m. on April 28, 2017, Tangoe executed and delivered the merger agreement and Tangoe and Marlin issued a joint press release announcing the transaction. *Id.* at 28.

After the announcement, "representatives of Stifel, under the direction and supervision of management of the Company, commenced a go-shop process," which, Tangoe explained, would expire on May 27, 2017. *Id.* at 29. As of the date of the 14D-9, Stifel had contacted 35 parties to determine whether they would be interested in pursuing a superior transaction. *Id.*

### 3.    The Reasons for the Board's Recommendation

Tangoe also stated the reasons for its recommendation that stockholders tender their shares of common stock under the offer. *Id.* at 29. It explained that it had "consulted with our management, as well as our legal and financial advisors, and considered the terms of the proposed Merger Agreement, the Offer and the Merger and the other transactions set forth in the Merger Agreement, the restatement of the Company's financial results for the fiscal years ended December 31, 2013 and 2014 and the first three quarters of the fiscal year ended December 31, 2015 (the "Restatement") and related events, as well as the sale process . . . ." *Id.*

The Company also stated that it believed that the offer price of $6.50 per share in cash "was more favorable to the Company's stockholders than the value that might result from other potential transactions or remaining independent." *Id.* It stated that its belief was based on its negotiation process, its financial performance, "the advantages of entering into the Merger Agreement in comparison with the risks of remaining independent," and the "Company's ability

by consummating the Merger to avoid the cost and management distraction associated with completing the Restatement as to which the Company had incurred costs in excess of $16 million in 2016," given its inability to estimate when the Restatement would be completed and pending stockholder litigation in the District of Connecticut and an ongoing investigation by the SEC. *Id.* at 31 (citing *In re Tangoe, Inc. Securities Litig.*, No. 3:17-cv-146-VLB).

The Company also acknowledged potential drawbacks and risks related to the Merger, including that Tangoe would no longer exist as an independent company; that there could be no guarantee that the Offer and the Merger would be completed; that there would be a risk of litigation arising from the merger; that the Merger would be a taxable event; that after the go-shop period, the terms of the Merger would prohibit the Company from soliciting third-party bids; and that there could be potential costs if the Merger Agreement were terminated under certain circumstances. *Id.* at 31–32.

The Company stated that:

> After taking into account all of the factors set forth above, as well as others, the Company Board unanimously agreed that the benefits of the Offer and the Merger outweighed the associated drawbacks and risks and determined that the Merger Agreement and the transactions contemplated thereby, including the Offer and the Merger, are fair to, and in the best interests of, the Company and its stockholders, approved the Merger Agreement, and authorized and approved the Merger upon the terms and conditions set forth in the Merger Agreement and recommended that stockholders tender shares of Common Stock pursuant to the Offer.

*Id.* at 32. It also disclaimed that its reasons for recommending the tender offer was "not an exhaustive list of the information and factors considered by the Company Board in its consideration of the Offer and Merger, but is merely a summary of the material positive factors and material drawbacks and risks considered by the Company Board in that regard." *Id.*

### 4.    Stifel's Financial Analyses

Tangoe also provided an explanation of Stifel's analysis of the Merger. *Id.* at 32. Tangoe stated, in bold, that "[h]olders of Common Stock are encouraged to read the Opinion carefully and in its entirety for a description of the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken by Stifel in connection with the Opinion." *Id.* at 33. Tangoe attached the full text of Stifel's Opinion to the Schedule 14D-9. *Id.*; *see also* Annex I.

Tangoe explained the factors that Stifel had considered in its analysis, including publicly available financial statements, non-publicly available information, including unaudited financial statements and other internal documents, the terms of the merger, the negotiation process, the Company's trading activity, the interest of third-parties with respect to the Merger, and other general economic and financial conditions. *Id.* at 34–35. It also explained certain assumptions that Stifel made, including that Tangoe's unaudited financial statements were accurate, that the financial forecasts were reasonable and the best prediction that the Company could make, and there were no factors that Stifel was unaware of that would delay the Merger or change its terms. *Id.* at 35.

The Company instructed shareholders that, "[i]n order to fully understand the financial analyses performed by Stifel, you should read the tables together with the text of each summary," that the "tables alone do not constitute a complete description of the financial analyses," and that "[c]onsidering the information set forth in the tables without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of the financial analyses performed by Stifel." *Id.* at 36.

The Company explained that Stifel had concluded that, "as of the date of the Opinion, and subject to and based on the assumptions made, procedures followed, matters considered, limitations of the review undertaken and qualifications contained in the Opinion, the Offer Price to be received by holders of shares of the Common Stock, other than Excluded Shares, in the transaction pursuant to the Merger Agreement was fair to such holders of shares, from a financial point of view." *Id.* at 39.

### 5.      Tangoe's Financial Projections

Tangoe also provided certain financial projections, "which were prepared by management of the Company solely for purposes of evaluating a potential acquisition of the Company and reflect an assessment of prospects and risks related to estimated future revenues and other industry, market and product related factors." *Id.* at 40. The Company explained that the "summary of these financial projections is not being included in this Schedule 14D-9 to influence any stockholder's decision whether to tender his, her or its Shares in the Offer, but instead because these financial projections were provided to Stifel, the Company Board and the Parent to evaluate the Merger." *Id.* at 41. The Company warned that "stockholders are cautioned not to place undue, if any, reliance on these projections." *Id.* Still, the Company provided its projected revenue, costs, expenses, and cash flow. *Id.* at 42.

### 6.      Effect of the Tender Offer on Shareholders' Rights

Finally, Tangoe explained the effect of the tender offer on shareholders' rights, including the votes required for the merger to go through, the shareholders' appraisal rights, and the consequences of not tendering shares in the offer. *Id.* at 44–45.

## II.    STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089 (2002). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff has stated a claim upon which relief may be granted, such that it should be entitled to offer evidence to support its claim. *See id.* (citation omitted).

While a court must accept as true the allegations in a complaint, this requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).

In addition, if the complaint sounds in fraud, the complaint "must also satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995, which require that 'securities fraud complaints specify each misleading statement . . . [and] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Westchester Teamsters Pension Fund v. UBS AG*, 604 Fed. App'x 5, 7 (2d Cir. 2015) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)). Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), aff'd 566 Fed. App'x 93

(2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)); *see also* Fed. R. Civ. P. 9(b) (requiring that a complaint that alleges fraud plead "the circumstances constituting fraud . . . with particularity")).

"The PSLRA similarly requires that the complaint 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' and it adds the requirement that 'if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (quoting 15 U.S.C. § 78u–4(b)(1)); *see also City of Roseville Emps' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 401 (S.D.N.Y. 2011); *see also* 15 U.S.C. § 78u-4 ("In any private action arising under this chapter in which the plaintiff alleges that the defendant—(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary . . . the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

In considering the motion to dismiss, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *Soueidan v. Breeze-Eastern Corp.*, 2017 WL 627456, at *4–5 (S.D.N.Y. Feb. 15, 2017) (considering Schedule 14D-9 and Amended 14D-9 Forms because the complaint had cited and relied on those documents). A court also may take judicial notice "of public disclosure documents that must be

filed with the Securities and Exchange Commission ('SEC') and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)).

## III.  DISCUSSION

Defendants move to dismiss, arguing that Plaintiffs failed to identify a material misstatement or omission; failed to plead that Defendants acted with scienter; failed to allege an economic loss as a result of Defendants' actions; and that Plaintiffs' allegations related to the challenged transaction with Marlin are not actionable under Section 14(e) because that Section does not provide a remedy for a breach of fiduciary duty. Mot. Dismiss at 1. Defendants argue that Plaintiffs' Section 14(d) claims fail for the same reasons that the Section 14(e) claims fail, and having failed to state a primary claim, Defendants argue, Plaintiffs' Section 20(a) claim must also fail. Mot. Dismiss at 2. The Court agrees.

### A.  Section 14(e)

As the Second Circuit recognized several decades ago: "The securities laws seek to prevent restrictions which distort the market's estimate of value." *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 357 (2d Cir. 1973). As a result, "Congress and the courts justifiably have outlawed all unfair and deceptive practices related to the trading of securities and have encouraged private damage actions to implement the enforcement of the federal securities laws." *Id.* Section 14(e) of the Exchange Act of 1934 is one such statutory provision, specifically addressing unfair and deceptive practices related to tender offers and provides that:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent,

deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation . . . .

*See* 15 U.S.C. § 78n(e).

Section 14(e) "make[s] applicable to a tender offer the long established antifraud proscriptions of the federal securities laws" and to do so, it "require[s] tender offer disclosures similar to those required for issuance of new securities [and] . . . provides for openness and truthfulness in the solicitation of shares through tender offers and in the opposition to such solicitation." *Chris-Craft Indus., Inc.*, 480 F.2d at 358–59 (citing the Senate Report accompanying proposed § 14(e), S. Rep. No. 510, 90th Cong., 2d Sess. (1968)); *see also Telenor E. Invest AS v. Altimo Holdings & Investments Ltd.*, 567 F. Supp. 2d 432, 443 (S.D.N.Y. 2008) ("Largely modeled after section 10(b), it prohibits material misstatements, omissions, and fraudulent practices in connection with a tender offer."). "The purpose of Section 14(e) is to regulate the conduct of a broad range of people who could influence the outcome of a tender offer." *Varjabedian v. Emulex Corp.*, 888 F.3d 399, 404 (9th Cir. 2018) (citing *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 24 (1977)). "To that end, Section 14(e) 'was expressly directed at the conduct of a broad range of persons, including those engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer.'" *Id.* (quoting *Piper*, 430 U.S. at 24).

To state a claim under Section 14(e), a plaintiff "must allege that (1) defendant misrepresented or omitted . . . material facts in connection with the purchase or sale of a security; (2) the shareholders relied to their detriment upon the misrepresentations or omissions; and (3) the misrepresentations or omissions were made with scienter." *Soueidan*, 2017 WL 627456, at *5 (citing *In re PHLCORP Sec. Tender Offer Litig.*, 700 F. Supp. 1265, 1268 (S.D.N.Y. 1988)). As

discussed below, Plaintiffs have failed to make the necessary allegations to state a valid claim under Section 14(e).

### 1.    Material Misrepresentation

First, Plaintiffs have failed to allege that Defendants "misrepresented or omitted . . . material facts in connection with the purchase or sale of a security." *See Soueidan*, 2017 WL 627456, at *5. "The general standard of materiality" is that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976); *see also Soueidan*, 2017 WL 627456, at *5 ("For a misstatement or omission to qualify as material, there must be 'a substantial likelihood that a reasonable shareholder would consider it important in deciding' whether to accept the tender offer.") (quoting *Prudent Real Estate Trust v. Johncamp Realty, Inc.*, 599 F.2d 1140, 1146 (2d Cir. 1979)). That is, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* In addition, "whether a statement is 'misleading' depends on the perspective of a reasonable investor: The inquiry (like the one into materiality) is objective." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015).

The total mix of information available to a reasonable investor includes "data sent to shareholders by a company in addition to its proxy materials . . . as well as other information 'reasonably available to the shareholders[.]'" *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993). "The mere fact that a company has filed with a regulatory agency documents containing factual information material to a proposal as to which proxies are sought plainly does not mean that the company has made adequate disclosure to

shareholders under Rule 14a–9. Corporate documents that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders." *Id.* at 1199.

Plaintiffs allege that the Recommendation Statement "contained material misrepresentations and omissions of fact that forced Tangoe's stockholders to decide whether to tender their shares without adequate information." CAC ¶ 76. Those misstatements and omissions, Plaintiffs argue, include the likelihood of whether Tangoe would complete the Restatement, non-merger alternative options, directors' and officers' potential conflicts of interest, and the lack of clear financial information based on audits and projections. CAC ¶ 77; see also ¶¶ 78–83, 86–96. In other words, Plaintiffs argue that Defendants' failure to provide stockholders with a clear picture of the Company's financial health and prospects—as well as the Individual Defendants' own interests in the transaction—prevented stockholders from making an informed decision about whether the offer price of $6.50 was a good price and precluded offers that could have competed with Marlin's tender offer.

More specifically, Plaintiffs argue that Defendants omitted material information in the Recommendation Statement, including information about why an investigation into the reasons Tangoe did not file restated financial results was never completed. Opp. to Mot. Dismiss at 21 (footnote omitted). Plaintiffs furthermore argue that, while Defendants may have filed documents related to the company's progress with its Restatement with the SEC that were available publicly, those filings "were not distributed to the Company's stockholders for the purpose of the Tender Offer." *Id.* at 22.

Plaintiffs also argue that Defendants omitted material information related to officers' and directors' potential conflicts of interest. *Id.* at 25. Plaintiffs assert that, although "Defendants

argue that this information was in fact disclosed across a panoply of documents with the SEC over several months," the "'total mix' of information only includes those documents and information actually distributed to stockholders." *Id.* Plaintiffs claim that Defendants did not distribute to stockholders information that "the EARCAs were only payable upon a change in control, termination without cause, or the death of the party," that the Recommendation Statement "entirely omitted the existence of price thresholds for full vesting of the EARCAs, what those price thresholds were, or that they were adjusted downwards on February 2, 2017," and "failed to state the EARCAs' vesting deadline to complete a deal by March 15, 2017, or its subsequent amendment to March 15, 2018." *Id.* at 24–25. Plaintiffs argue that that information was material to stockholders and should have been part of their evaluation of the Tender Offer. *Id.* at 26.

Defendants respond that the $6.50 offer price for Tangoe's shares, following a de-listing from NASDAQ, represented a successful cash out merger and a significant 19.5% premium over Tangoe's stock price at the time of the deal announcement. Mot. Dismiss at 1. Defendants argue that, throughout the transaction process, they regularly "updated shareholders on the Restatement effort, including that it could not estimate whether or when it would complete the restatement." Mot. Dismiss at 3; *see also* Panchenko Decl. Exs. A at 3, B at 4, C at 8, D at 4, F at 2–3, H at 3, I at 2 (various Forms 8-K and Form 12b-25 indicating that Tangoe would be missing its deadlines and indicating the efforts Tangoe was making to comply).

Defendants also argue that the Recommendation Statement provided "information regarding the proposed transaction and advised shareholders of the Board's recommendation in favor of the same." Mot. Dismiss at 4; *see also* Form 14D-9. Defendants argue that the Recommendation Statement included an explanation of the officers' and directors' financial

interests in the transaction, the chronology of the negotiation process, the reasons for the recommendation, and financial analyses. Mot. Dismiss at 4; *see also* Form 14D-9 at 7–12, 26–29. Defendants also argue that Plaintiffs have mischaracterized the Directors' financial incentives: "Individual Defendants would have earned the *same equity-based* compensation if either Tangoe (1) completed the Restatement, or (2) was sold." Mot. Dismiss at 5–6. Defendants also note that the Form 8-K that they filed on the same day as the Recommendation Statement was "referenced and incorporated into" the Recommendation Statement and therefore was part of the total mix of information available to the stockholders when they made a decision about the Tender Offer. Reply at 1, 5.

The Court agrees that, through the Recommendation Statement and the Exhibits attached to it, Tangoe provided shareholders with a total mix of information necessary to make an informed decision about whether to tender their shares. *See Hanson*, 774 F.2d at 57 (noting that the critical issue is whether "solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them"). Plaintiffs have not identified material misstatements or omissions sufficient to survive a motion to dismiss.

### a.      Information Relating to the Restatement

First, Tangoe did not omit material information about the completion of the Restatement that a reasonable shareholder would have considered "'important in deciding' whether to accept the tender offer." *Soueidan*, 2017 WL 627456, at *5 (quoting *Prudent Real Estate Trust*, 599 F.2d at 1146). In the Recommendation Statement—which contained the information that shareholders would have considered in making a decision about whether to tender their shares, which is the critical question under Section 14(e)—Tangoe explained that, beginning in March 2016, it realized that it had made errors and needed to restate its financial statements with the

SEC for 2013, 2014, and the first three quarters of 2015. Form 14D-9 at 17 (stating that Tangoe had "made errors in recognizing revenue, primarily relating to non-recurring revenue").

Tangoe also explained to shareholders that, beginning in August 2015, it "held over 25 meetings concerning the oversight of the Restatement," sought an audit of financial statements by an independent audit firm, and spent approximately $16 million in an effort to complete the Restatement. *Id.* Moreover, Tangoe told shareholders that, on December 20, 2016, it considered at a Board Meeting "the status of the Restatement, including preliminary indications that completion of a Restatement by the March 10, 2017 deadline might not be practicable[.]" *Id.* at 22. Finally, in its summary of the reasons for its recommendation, Tangoe stated that the Merger would allow the Company "to avoid the cost and management distraction associated with completing the Restatement as to which the Company had incurred costs in excess of $16 million in 2016," in light of its inability to estimate when it could complete the Restatement. *Id.* at 31.

Plaintiffs have not shown how more information related to Tangoe's efforts to complete the Restatement would have been relevant to a shareholder's evaluation of the tender offer. *See Soueidan*, 2017 WL 627456, at *5 ("For a misstatement or omission to qualify as material, there must be 'a substantial likelihood that a reasonable shareholder would consider it important in deciding' whether to accept the tender offer.").

While similar to *In re Saba Software, Inc. Stockholder Litig.*, No. CV 10697-VCS, 2017 WL 1201108 (Del. Ch. Mar. 31, 2017), *as revised* (Apr. 11, 2017). Opp. to Mot. Dismiss at 20, 23 ("*Saba* is directly on point[.]"), there is a significant difference between this case and that one. In that case, the Delaware Chancery Court considered Saba's disclosures related to an all-cash merger with Vector Capital Management, L.P. following repeated (and ultimately, unfulfilled) promises to restate its financial statements by a date certain. *See In re Saba*, 2017

WL 1201108, at *3–6. "Given its past history" as well as the "circumstances surrounding the Company's past and latest failure to deliver its restated financials," *see id.* at 12, the Delaware Chancery Court found that the absence of information regarding whether the company would ever complete a restatement of its financial statements was a material omission. *Id.*

But there, Saba's "past history" and the "circumstances surrounding the Company's past and latest failure" notably included a SEC charge against two former *Saba* executives who had engaged in a fraudulent scheme to overstate Saba's pre-tax earnings over a four-year period by $70 million, which created a significant cloud over any of Saba's financial projections about the company's value. *See id.* at 12 (Plaintiff had "earned a pleading-stage inference that the stockholders would need all material information regarding the likelihood that the Company could ever complete the Restatement in order meaningfully to assess the credibility of the management projections" because, "[w]ithout the means to test that assumption [that the Company would complete the Restatement at some point] by drilling down on the circumstances surrounding the Company's past and latest failure to deliver its restated financials, stockholders had no basis to conclude whether or not the projections made sense."). In the absence of such "past history" or similar "circumstances" here—neither the SEC nor the Plaintiffs have alleged a fraudulent scheme by Tangoe's management, past or present—the absence of information regarding whether Tangoe would ever complete the Restatement cannot similarly be considered to be a material omission.

The Court thus finds that shareholders here were provided with information that the Company discovered problems in its financial accounting, made efforts to correct those problems, but the efforts to correct the problems were costly and time-consuming. *See* Form 14D-9 at 17, 22. Those costs affected the Company's recommendation that a merger with Marlin

would be in the Company's best interest, and it told the shareholders as much. *Id.* at 31. Any

additional information that the shareholders seek are either "properly characterized as

'quibbles,'" *Sodhi*, 2015 WL 273724, at *6, or would require that the Board disclose

"information that simply does not exist[.]" *In re JCC Holding Co., Inc.*, 843 A.2d at 721.[8]

### b. Information about the Officers' and Directors' Financial Interests

Second, Tangoe disclosed in its Recommendation Statement that the directors and

officers would receive in total over $1.6 million in common stock, based on each individual's

potential cash consideration. Form 14D-9 at 8. It also stated that the officers' and directors' stock

options under a 2005 Stock Incentive Plan and a 2011 Stock Incentive Plan. *Id.* at 8–9. It also

disclosed that it had retention agreements and EARCAs with each officer and director. *Id.* at 12.

The Recommendation Statement explained that the EARCAs "provide for payment of such

awards upon the closing of a change in control, which would include the Merger," and it attached

a sample EARCA to the Recommendation Statement. *Id.*; Ex. N at 68, ECF No. 48-14; *cf.* Opp.

to Mot. Dismiss at 24–25 (arguing that Defendants did not notify shareholders that "the

EARCAs were only payable upon a change in control, termination without cause, or the death of

the party"). The Recommendation Statement also disclosed the "golden parachutes" that the

---

[8] Plaintiffs also argue that Defendants disclosed certain information to the SEC and that shareholders should not be expected to have had access to filings that were not "distributed to the Company's stockholders for the purpose of the Tender Offer." Opp. to Mot. Dismiss at 22. The Court disagrees that filings with the SEC are not publicly available information that a shareholder could consider as part of the "total mix" of information in making a decision about whether to tender shares. *See, e.g.*, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 373 (E.D.N.Y. 2003) (considering documents filed on EDGAR, the SEC's electronic filing system, and noting that, "[w]hether or not it was ever true that filing hard copies of documents with the SEC did not, *ipso facto*, constitute 'public disclosure,' in today's world it is unrealistic to argue that documents available on the SEC website are not readily accessible to the investing public"). In any event, the Court finds that any information that Tangoe disclosed to the SEC and not explicitly in its Recommendation Statement is harmless because, considering the context of the information that Defendants did provide in the Recommendation Statement, Plaintiffs have not identified information that was missing from that document, which was provided to shareholders as they decided whether to tender shares.

Company had provided to each officer and director and listed the terms of each package. *Id.* at 13–15.

Plaintiffs argue that Defendants disclosed information about the Defendants' financial information in documents filed with the SEC, but not distributed to shareholders, that were spread out over several months, and that those disclosures should not be considered a part of the total mix of information available to shareholders making a decision about whether to tender their shares. Opp. to Mot. Dismiss at 25 (citing *United Paperworks Int'l Union*, 985 F.2d 1190 (finding that the defendant's 10–K report filed with the SEC was not part of total mix of information available to reasonable shareholder)). The Court disagrees.

First, filings with the SEC over several months should be considered part of the total mix of information a shareholder would consider in deciding whether to tender shares. *See In re Keyspan*, 383 F. Supp. 2d at 374 n.6 (finding that *United Paperworks* "predates [] the explosion in Internet availability and use generally, and the institution of mandatory filing on EDGAR in particular. Moreover, if read too broadly, the holding that shareholders cannot be charged with knowledge of information in a company's SEC filings would undermine the very rationale for allowing consideration of such filings on a motion to dismiss—namely, that such filings are matters of public record. . . . It would make little sense never to consider 10–K forms and other SEC filings to be public information, given that the fundamental purpose of such filings is to protect investors by requiring publicly traded companies to disclose information about their operations and finances."); *see also Tapia-Matos v. Caesarstone Sdot-Yam, Ltd.*, 15-CV-6726 (JMF), 2016 WL 3951184, at *3 (S.D.N.Y. 2016) (taking into consideration information the company disclosed in its annual SEC filings and noting that, "as the Second Circuit has made clear, SEC filings and documents distributed to shareholders are more significant than

'[c]orporate documents that have not been distributed to the shareholders,' which should 'rarely be considered part of the total mix of information reasonably available' to shareholders.").

But even if, here, the Court did not consider Defendants' SEC filings a part of the "total mix of information" disclosed to shareholders before the tender offer, the Recommendation Statement itself would be part of the total mix of disclosed information. *See United Paperworkers Int'l Union*, 985 F.2d at 1198 (describing total mix of available information to reasonable investor as "data sent to shareholders by a company in addition to its proxy materials . . . as well as other information 'reasonably available to the shareholders'"). Because Defendants disclosed their financial stakes in the transaction in the Recommendation Statement, which was intended to equip shareholders to make an informed choice about the merger, the Defendants did not materially misstate or omit their financial interests in the merger.

### c. Financial Projections and Stifel's Analysis

Finally, Plaintiffs argue that Defendants omitted material information about downward projections in the Company's financial forecasts, or omitted or misstated information about Stifel's analysis. *See* Opp. to Mot. Dismiss at 16 ("The Recommendation Statement indicated that management adjusted financial projections downward at least four different times during the sales process," and "omitted the degree or severity of these adjustments, and only offered the final set of projections provided to stockholders."); *id.* at 26 (same); *id.* at 17 ("With respect to Stifel's Selected Company and Selected Transactions Analyses, the Recommendation Statement failed to disclose the individual multiples for the companies and transactions observed in the analysis."); *id.* at 27–28 (same).

Defendants respond that Plaintiffs "do not dispute that Defendants disclosed the Company's *then current* projections," and do not "allege facts to suggest that prior, superseded

projections were more accurate or even were relevant to shareholders' consideration of the offer price." Def.'s Reply at 8. Moreover, Defendants argue that Plaintiffs fail to establish that "the 'inputs and assumptions' underlying Stifel's financial analyses was material," and argue that "a 'disclosure statement must contain only a fair summary of the underlying bases for a financial advisor's fairness opinion' and *need not* disclose every underlying detail." *Id.* (quoting *Sodhi*, 2015 WL 273724, at \*5). The Court agrees.

Plaintiffs have not established that either the financial projections or the Stifel analysis omitted material information that a reasonable shareholder would have considered in deciding whether to tender shares. *See TSC Indus.*, 426 U.S. at 449 ("The general standard of materiality" is that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.").

First, in explaining its financial projections, Tangoe explained that, beginning in August 2015, the Company began to report lower than expected financial results, and its stock began to drop. Form 14D-9 at 16 ("the Company reported lower than expected results of operations for the quarter ended June 30, 2015," when the Company's common stock dropped from $10.35, on August 6, 2015, to $7.09, on August 7, 2015). Tangoe also explained that when it announced that it had made errors in its financial statements, its "stock dropped from $7.75 on March 7, 2016, to $7.05 on March 8, 2016." *Id.* at 17. Tangoe stated that during its negotiations with Marlin as well as Clearlake and Vector, at the end of 2016, it announced that the SEC's deadline for filing a Restatement would not be practicable. *Id.* at 22. On December 27, 2016, the Board reported that it had "lower than expected cash balances." *Id.* At that point, Marlin made a cash tender offer at $7.50 per share. *Id.* Days later, Clearlake and Vector made an offer at $7.00 per share. *Id.* at 23.

Eventually, after Marlin had an opportunity to do diligence on the Company, it offered $6.50 per share in cash. *Id.* at 25.

Second, in explaining what Stifel did, Defendants provided shareholders with the information that Stifel used to reach its conclusions, and provided them with those conclusions. *See* Form 14D-9 at 36. In other words, Defendants did not do the analysis itself for shareholders, but gave shareholders the information they would need if they wanted to do any of the analyses performed for themselves. *See id.* at 38 ("In evaluating the precedent transactions, Stifel made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, some of which are beyond the Company's control, such as the impact of competition on the Company's business or the industry generally . . . ."). This disclosure provided a reasonable shareholder with the information necessary to understand the negotiation process and the financial analysis that experts conducted. Plaintiffs have not established that there was material information that would have affected a shareholder's decision whether to tender his or her shares, or that they were entitled to more information than they have. *See Sodhi*, 2014 WL 273724, at *5 ("[A] disclosure statement must contain only a fair summary of the underlying bases for a financial advisor's fairness opinion. . . . Investors, as a general matter, are *not* entitled to disclosures sufficient to make [their] own independent assessment of a stock's value.") (internal quotation marks and citation omitted) (citing *Resnick v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) (noting, in proxy statement context, "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor")).

The Court therefore finds that Plaintiffs have failed to allege that Defendants materially misstated or omitted information that a reasonable shareholder would have considered important in making a decision about whether to tender shares.

### 2. Scienter

Although the Court has already found an adequate basis to dismiss the Complaint—that Plaintiffs have failed to allege a material misstatement—the Court also agrees with Defendants that, in the Second Circuit, a securities fraud plaintiff is still required to plead with scienter under *Connecticut National Bank*, and finds that Plaintiffs have not adequately pleaded scienter.

"To plead scienter so as to survive a motion to dismiss, a plaintiff must state 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[.]'" *Westchester Teamster Pension Fund*, 604 Fed. App'x at 7 (quoting *Tellabs, Inc.*, 551 U.S. at 326).

Scienter "may be established by facts '(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *City of Pontiac Policemen's and Firemen's Retirement Sys.*, 752 F.3d at 184 (quoting *ASTI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)); *see also Sodhi*, 2015 WL 273724, at *7 ("A securities plaintiff can plead scienter by alleging that the defendant had a motive and an opportunity to commit securities fraud.") (citing *In re Scholastic Corp.*, 252 F.3d 63, 74 (2d Cir. 2001) ("Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness.")).

Recklessness means "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). "The requisite 'strong inference' of scienter is one which is '*at least as likely as* any plausible opposing inference.'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 328).

Defendants argue that Plaintiffs failed to allege "particular factual allegations sufficient to support a strong inference that Defendants acted with scienter—*i.e.*, an intent to defraud investors." Mot. Dismiss at 21 (citing *Conn. Nat. Bank*, 808 F.2d at 961). Plaintiffs respond that they are not required to plead that Defendants acted with scienter.

Plaintiffs also allege that, during the course of seeking extensions and filing Forms 12b-25, while stating that Tangoe intended to and was likely to regain compliance with the SEC and NASDAQ, *see, e.g.*, CAC ¶¶ 33–34, 36–40, 42–43, and while failing to hold annual stockholder meetings, CAC ¶¶ 44–45, Tangoe and its Board did not intend to comply with the SEC or NASDAQ, see, e.g. CAC ¶ 45 ("[I]t appears that the decision to shift focus to selling the Company was not the result of the inability to timely complete the Restatement, but a consequence of the Board's selfish decision to avoid being ousted at an annual stockholder meeting.").

Instead, Plaintiffs argue, Tangoe and its Board pursued a transaction, ultimately with Marlin, which allowed the Company to avoid regulatory compliance. CAC ¶ 44 (alleging that, when the Company realized that it was unlikely to complete the Restatement by the March 10, 2017, deadline, "the Board noted the potential for an acquisition transaction in the near term may

obviate the need to complete a Restatement."); ¶ 65 (stating that Defendants were unlikely to complete the Restatement by March 10, 2017). Plaintiffs allege, moreover, that Tangoe and its Board had financial incentive to pursue a buyout. *See, e.g.*, CAC ¶ 48 (alleging that EARCAs granted Tangoe's officers and directors equity compensation only upon a change in control of the company), ¶¶ 49–54 (detailing specific EARCA agreements).

Plaintiffs argue that they adequately pled scienter by alleging that "despite knowing the Recommendation Statement omitted [ ] material information . . . Defendants intentionally omitted such information from the Recommendation Statement" to induce stockholders to tender their shares in the Tender Offer "and maximize their own personal gain." Opp. to Mot. Dismiss at 36 (citing CAC ¶¶ 81–82 (alleging that "the Recommendation Statement failed to disclose the factual circumstances regarding Tangoe's repeated failure to complete the Restatement," and that the omitted material was "plainly material to stockholders for a myriad of reasons"); *id.* ¶ 87 (alleging that the fact that the Board Members adjusted the thresholds of their EARCAs "downwards would have informed stockholders that the Board's true motive was not maximum shareholder value, but personal gain" and that the "new lower thresholds would have informed stockholders how much the failure to complete the Restatement cost them")).

The Court disagrees with Plaintiffs.

As to Plaintiffs' first argument, that scienter does not apply, the Second Circuit has "examined the concept of scienter, and the allegations of scienter that must be made to survive a motion to dismiss, in the context of claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1986)" and has determined that "[i]nsofar as these cases deal with the adequacy of allegations of scienter, they are applicable to claims under the Williams Act." *Connecticut Nat. Bank*, 808 F.2d at 961 (citing

*Chris-Craft Indus., Inc.*, 480 F.2d at 362 (applying principles developed under Rule 10b–5 to evaluate § 14(e) violations)); *see also Schrieber v. Burlington Northern, Inc.*, 472 U.S. 1, 10 (1985) (explaining that § 14(e) is "modeled on the anti-fraud provisions of § 10(b) . . . and Rule 10b–5").

Plaintiffs do not rely on Second Circuit precedent, but instead note, correctly, that the Ninth Circuit recently interpreted the Supreme Court's ruling in *Aaron v. Securities and Exchange Commission*, 446 U.S. 680 (1980), to extend to Section 14(e). The Ninth Circuit explained that the "Supreme Court provided useful guidance for interpreting the first clause of Section 14(e) of the Exchange Act in *Aaron v. SEC* . . . . The securities provision at issue in *Aaron*—Section 17(a)(2) of the Securities Act of 1933—and the first clause of Section 14(e), contain nearly identical wording," and "the Court in *Aaron* held that Section 17(a)(2) does *not* require a showing of scienter." *Varjabedian*, 888 F.3d at 406.

While the Ninth Circuit has abandoned the requirement of pleading scienter for claims under Section 14(e), neither the Supreme Court—since its decision in *Aaron* considered Section 17(a)(2) of the Securities Act, not Section 14(e) of the Exchange Act—nor the Second Circuit has abandoned scienter as an element of pleading a claim under Section 14(e), and this Court therefore will continue to apply the current law in this Circuit. *See Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 107–08 (2d Cir. 2010) ("In resolving disputes, we 'should follow the case which directly controls.'") (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

Indeed, this course has been the one followed by other district courts in this Circuit. *See Sodhi*, 2015 WL 273724, at *7 (noting, in 2015, that scienter would be "an independently sufficient ground on which to grant [a] motion to dismiss"); *Soueidan*, 2017 WL 627456, at *4–5

(listing, in 2017, the elements of a Section 14(e) claim: "(1) defendants misrepresented or omitted to state material facts in connection with the purchase or sale of a security; (2) the shareholders relied to their detriment upon the misrepresentations or omissions; and (3) the misrepresentations or omissions were made with scienter").

Second, Plaintiffs have not adequately alleged that Defendants acted with a motive to commit fraud. They have not alleged that Defendants intentionally or recklessly lied about their ability to complete the Restatement. For example, Plaintiffs allege that Tangoe stated that "[a]lthough the Company cannot at this time estimate when it will complete the Restatement and file its restated financial statements and its Form 10-K for the year ended December 31, 2015, it is *diligently pursuing completion of the Restatement* and intends to file the Form 10-K as soon as reasonably practicable." CAC ¶ 34 (emphasis added by Plaintiffs in CAC). Plaintiffs also allege that Tangoe failed to hold stockholder meetings and infer that the Board did not intend to comply with rules established by the SEC or NASDAQ. *See* CAC ¶¶ 44–45 ("[I]t appears that the decision to shift focus to selling the Company was not the result of the inability to timely complete the Restatement, but a consequence of the Board's selfish decision to avoid being ousted at an annual stockholder meeting."). Plaintiffs, however, have failed to plead with particularity under Rule 9(b) and the PSLRA that Defendants acted with a motive to commit fraud—and not simply that they changed their mind about the best decisions for the company. *See* Reply at 6 ("[I]t makes no sense to require a company to guess about an uncertain future date for restatement completion—something *that itself* could be challenged as misleading.").

Plaintiffs have also failed to link the incentive structure in the EARCAs with a motive to commit fraud. Plaintiffs alleged that "the Board acted selfishly and disloyally by pushing through an inadequate offer with Marlin and, at the same time, ensuring that millions of dollars in equity

award equivalents would vest upon consummating the Transaction." CAC ¶ 56. Plaintiffs further alleged that the Individual Defendants "understood that they were set to collectively receive nearly $5 million in exchange for their measurement shares under the EARCAs" if they voted for the transaction with Marlin, and "[i]f the Director Defendants voted against the Transaction and opted to complete the Restatement and proceed as a standalone company, their EARCAs would have been worthless." *Id.* ¶ 57.

As Defendants explained, however, the EARCAs were structured to "incentivize[] them to maximize shareholder value whether through the Restatement or a sale." Reply at 3–4. Moreover, Defendants disclosed the details of the EARCAs in the Restatement. *See, e.g.*, 14D-9 at 8–9 ("The Company is party to retention agreements with each of Messrs. Foy, Flynn, Sheridan, ad Wansong, which specify the amounts payable to such executive officer in connection with certain termination events . . . . [They] will be entitled to the following severance: a lump sum payment equal to (i) a pro rata portion of 100% of the applicable executive officer's aggregate quarterly and annual bonuses payable with respect to the last fiscal year ended before termination," with certain other conditions related to bonuses, and "upon a change in control, each of Messrs. Flynn, Sheridan, and Wansong are entitled to full acceleration of any unvested equity awards, but only Mr. Flynn has such awards."); *id.* at 9–10 (stating that "[t]he Company has entered into EARCAs with each executive officer and director to provide equity-based compensation despite the Company's inability to issue awards under Form S-8 . . . . The EARCAs provide for payment of such awards upon the closing of a change in control, which would include the Merger" and including a chart stating the payments under the EARCAs); *id.* at 10–11 (explaining structure and providing table of "Golden Parachute Compensation").

Plaintiffs thus have failed to allege that, despite disclosing the details of a financial arrangement with Tangoe, Defendants had a motive to commit fraud in the interest of securing their EARCAs. The fact that Defendants could benefit from the transaction alone is not sufficient to support a finding of scienter. *See In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 CIV. 4388 (JGK), 2004 WL 376442, at *7 (S.D.N.Y. Feb. 27, 2004) (finding that allegation that defendant was motivated to protect his reputation was insufficient to support scienter).

Defendants' motion to dismiss Plaintiffs' claims under Section 14(e) because of the lack of scienter therefore is granted.

### 3. Economic Loss

Finally, the Court also finds that Plaintiffs failed to plead that they suffered an economic loss as a result of any of Defendants' alleged material misstatements or omissions.

The third element of a claim under Section 14(e) requires that Plaintiffs allege "loss causation." *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 338 (2005) ("A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss."); *Soueidan*, 2017 WL 627456, at *5 (requiring pleading that "shareholders relied to their detriment upon the misrepresentations or omissions"); *see also Little Gem Life Scis. LLC v. Orphan Med., Inc.*, No. CIV 06-1377 ADM/AJB, 2007 541677, at *7 (D. Minn. Feb. 16, 2007) (applying loss causation in Section 14(e) context).

Plaintiffs argue that the Complaint adequately alleges that "Tangoe was worth more than the Recommendation Statement suggested had Company insiders focused solely on the Restatement, which means Tangoe shareholders should have received more consideration for their shares," and that "the Transaction undervalued Tangoe in light of its independent growth

prospects had the Restatement been completed and that the Transaction did not properly account for Tangoe's inherent value." Opp. to Mot. Dismiss at 38.

Defendants respond that Plaintiffs have failed to, and cannot, allege that "Marlin or anyone else would have paid more for the Company or that Tangoe shares would have been more valuable if it remained a standalone company, much less that the alleged omissions somehow prevented shareholders from realizing that value." Reply at 10. Defendants argue that Plaintiffs have claimed an informational injury, not an economic one. Mot. Dismiss at 22 ("[T]hey claim only that Defendants' misrepresentations and omissions 'deprived [Plaintiffs] of their entitlement to make a fully informed decision on whether to tender their shares.'") (quoting CAC ¶¶ 72, 78). The Court agrees.

The Recommendation Statement explains that the Board engaged in an exclusivity agreement with Marlin after other potential financial sponsors withdrew, after they had reviewed Tangoe's financial health. *See* Form 14D-9 at 26. Plaintiffs' argument rests on the notion that, if Tangoe had pursued the Restatement, it would have been in a better position to attract higher offers than Marlin's $6.50 cash offer. *See* Opp. to Mot. Dismiss at 38.

But the Recommendation Statement explains that the Board continued to pursue completing the Restatement until the financial and time burden of completing it—and remaining delisted from NASDAQ while in that process—put enough strain on the Company that the Board grew aware that a proxy contest loomed and the best avenue out of its problematic financial statements could be a merger. *See, e.g.*, Form 14D-9 at 17 (explaining that, beginning in August 2015, Tangoe "held over 25 meetings concerning the oversight of the Restatement," sought an audit of financial statements by an independent audit firm, and spent approximately $16 million in an effort to complete the Restatement); *id.* at 18 (explaining that the Company considered "the

fiduciary duties of directors in considering or responding to acquisition proposals, as well as the

applicable requirements . . . to hold an annual meeting if requested by stockholders to do so and

limitations on the Company's ability to solicit proxies should such a meeting be held in light of

the pending Restatement"); *id.* at 22 (explaining that on December 20, 2016, the Board held a

meeting and "heard reports on the status of the Restatement, including preliminary indications

that completion of a Restatement by the March 10, 2017 deadline might not be practicable," and

considered proposed timelines from Marlin and Clearlake and Vector). Moreover, in the Board's

explanation of its reasons for its recommendation in the Recommendation Statement, it explicitly

considers whether $6.50 is an attractive value, and concludes that Tangoe would have been

unlikely to have a higher competitive offer either from another entity or from Marlin. Form 14D-

9 at 30.

Because Plaintiffs have failed to allege any facts, other than merely conclusory ones, to

support a viable economic loss, the Complaint must be dismissed.

**B.    Section 14(d)(4) and Rule14d-9**

Defendants move to dismiss Count Two, which claims that Defendant violated Section

14(d)(4) of the Exchange Act and SEC Rule 14d-9, arguing that those claims are "based on the

same flawed theories of liability as Plaintiffs' Section 14(e) claim[.]" Mot. Dismiss at 23.

Section 14(d)(4) of the Exchange Act provides:

> Any solicitation or recommendation to the holders of such a security
> to accept or reject a tender offer or request or invitation for tenders
> shall be made in accordance with such rules and regulations as the
> Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

15 U.S.C. § 78n(d)(4); *see also Am. Ins. Mortg. Investors v. CRI, Inc.*, 1990 WL 192561, at *4

(S.D.N.Y. Nov. 26, 1990) (explaining that in the context of claims under Sections 14(d) and

14(e), "each of which broadly prohibits dissemination of material misstatements and omissions,"

"[p]robably there will be no more a perfect tender offer than a perfect trial" but in the requirements of the Exchange Act "Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management [or competing tender offerors] to protect [their] own interests against the desires and welfares of the stockholders"); *see also Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 55 (2d Cir. 1985) ("The purpose of the Williams Act was, accordingly, to protect the shareholders from that dilemma [of being forced to make a decision without adequate information] by insuring 'that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information.'") (quoting *Piper*, 774 F.2d at 55).

The Court agrees with Defendants that, for the same reasons that Plaintiffs' claims fail under Section 14(e), they also fail under Section 14(d). *See* Mot. Dismiss at 23. The critical issue for claims under Section 14(d), like Section 14(e), is whether "solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them." *Hanson*, 774 F.2d at 57. As the Court explained in its analysis of Section 14(e) above, Plaintiffs failed to allege that shareholders lacked material information sufficient to evaluate the adequacy of the tender offer. Defendants' motion to dismiss Count Two therefore is granted.

## C.  Section 20(a)

Defendants also argue that Count Three must be dismissed because Plaintiffs have failed to state a primary violation of a securities law, and therefore any claim under Section 20(a) against the Individual Defendants as control persons must fail. Mot. Dismiss at 23 (citing *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004) (explaining that a control person claim "is necessarily predicated on a primary violation of securities law" and finding that because the

"district court properly dismissed the primary securities claims against the individual defendants, these secondary claims must also be dismissed")); *see also Sodhi v. Gentium S.p.A.*, 2015 WL 273724, at *3 ("Section 20(a) imposes liability on any person who 'directly or indirectly [] controls any person liable' under Section 14(e).") (quoting 15 U.S.C. § 78t(a)). The Court agrees.

Because the Court has dismissed Plaintiffs' claims of any primary violation of a securities law, their derivative Section 20(a) claim must also be dismissed. *See One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 Fed. App'x 75, 82 (2d Cir. 2010) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)) ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show, among other things, 'a primary violation by a controlled person.'"). Defendants' motion to dismiss Count Three therefore is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Consolidated Class Action Complaint is **GRANTED**.

To the extent that the deficiencies identified in this ruling, Plaintiffs may file a motion for leave to amend the Complaint by September 7, 2018.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of July, 2018.

/s/ Victor A. Bolden
THE HONORABLE VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE